UNITED STATES, Appellee,

v.

Victoria A. CATALANI, Airman First Class, U.S. Air Force, Appellant.

No. 96–0875.
Crim.App. No. S29021.

U.S. Court of Appeals for the Armed Forces.

Argued Jan. 7, 1997.

Decided Aug. 18, 1997.

For Appellant: *Major Gerald R. Bruce* (argued); *Colonel Jay L. Cohen, Colonel David W. Madsen,* and *Captain Harold M. Vaught* (on brief); *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Major Karen L. Manos* (argued); *Colonel Theodore J. Fink, Lieutenant Colonel Michael J. Breslin,* and *Major Allen*

*G. Erickson* (on brief); *Major John H. Kongable.*

## Opinion of the Court

EFFRON, Judge:

On December 13, 1994, appellant was tried by a military judge sitting as a special court-martial. Appellant pleaded not guilty to a single specification of desertion but guilty to the lesser-included offense of absence without leave. *Compare* Art. 85 *with* Art. 86, Uniform Code of Military Justice, 10 USC § 885 and 886, respectively. Contrary to her pleas, she was found guilty of desertion, and the military judge sentenced her to a bad-conduct discharge, confinement for 5 months, forfeiture of $555.00 pay per month for 6 months, and reduction to the lowest enlisted grade. The convening authority reduced the period of forfeitures to 3 months but otherwise approved the sentence. The Court of Criminal Appeals affirmed in an unpublished opinion.

We granted review of the following issue: WHETHER THE ADDENDUM TO THE SJA[STAFF JUDGE ADVOCATE]'S RECOMMENDATION IS DEFECTIVE IN (1) FAILING TO DIRECT THE CONVENING AUTHORITY TO CONSIDER APPELLANT'S CLEMENCY MATTERS AND (2) INJECTING "NEW MATTER" NOT PROVIDED TO DEFENSE COUNSEL FOR COMMENT, NECESSITATING A NEW CONVENING AUTHORITY ACTION IN THIS CASE.

We agree that the SJA erred and that, under the circumstances of this case, remedial action is necessary.

## I

In every court-martial, the findings and sentence adjudged at trial are subject to review by the convening authority. Art. 60, UCMJ, 10 USC § 860 (1983). With respect to the sentence, the convening authority is required to take action by approving, disapproving, commuting, or suspending the sentence in whole or in part. Art. 60(c)(2).

Prior to taking action in any general court-martial or in a special court-martial involving a bad-conduct discharge, the convening authority must obtain and consider the SJA's recommendation. Art. 60(d); RCM 1106(a), Manual for Courts–Martial, United States (1995 ed.). The SJA's recommendation must be served on defense counsel and the accused, RCM 1106(f)(1), who may submit "corrections or rebuttal to any matter in the recommendation believed to be erroneous, inadequate, or misleading, and may comment on any other matter." RCM 1106(f)(4). After defense counsel and the accused have had an opportunity to comment, the SJA may provide the convening authority with an addendum that supplements the SJA's original recommendation. "When new matter is introduced" in the addendum, the accused and counsel must be served with the addendum, and they have 10 days in which to submit comments. RCM 1106(f)(7).

The provision in RCM 1106(f)(7) requiring that new matter be served on the defense is based on *United States v. Narine*, 14 MJ 55 (CMA 1982). Drafters' Analysis of RCM 1106, Manual, *supra* at A21–81. The Rule does not define the term "new matter," and this Court has not attempted a comprehensive definition. The non-binding Discussion that follows RCM 1106(f)(7) provides a number of illustrations of new matter, which this Court has cited with approval. *See United States v. Chatman*, 46 MJ 321, 323 (1997); *United States v. Leal*, 44 MJ 235, 236 (1996). Examples include "the effect of new decisions on issues in the case, matter from outside the record of trial, and issues not previously discussed." RCM 1106(f)(7), Discussion. The Discussion also states that new matter "does not ordinarily include any discussion by the staff judge advocate ... of the correctness of the initial defense comments on the recommendation."

We have held that if the SJA includes new matter in an addendum that is not provided to the accused, the accused is entitled to a new SJA recommendation and action by the convening authority unless the new matter is "neutral, neither derogatory nor adverse to appellant," or if it is " 'so trivial' as to be nonprejudicial." *United States v. Jones*, 44 MJ 242, 244 (1996). Otherwise, when the

defense has been denied the opportunity to respond to new matter, we have ordered a new recommendation without making a determination that the convening authority would have granted further clemency. As we noted recently in *Chatman, supra* at 323:

> In the past our position has been that, when an appellant has been "deprived of an opportunity to deny, counter, or explain" the new matter, "[w]e will not speculate on what the convening authority would have done if he had been presented with an accurate record." *Leal,* 44 MJ at 237.

*Accord Jones, supra* at 244.

In *Chatman,* we addressed the question of the applicable appellate standard when the SJA fails to serve on the defense an addendum that contains new matter, to which the accused has the right to notice and an opportunity to respond. There, we held that, in the future, an appellant must

> demonstrate prejudice by stating what, if anything, would have been submitted to "deny, counter, or explain" the new matter. We believe that the threshold should be low, and if an appellant makes some colorable showing of possible prejudice, we will give that appellant the benefit of the doubt and "we will not speculate on what the convening authority might have done" if defense counsel had been given an opportunity to comment. *Jones, supra* at 244; *see United States v. DeGrocco,* 23 MJ 146, 148 (CMA 1987).

46 MJ at 323–24 (citation omitted). However, because *Chatman*'s requirement to demonstrate a "colorable showing of possible prejudice" applies only to "cases in which a petition for review is filed after the date" of the *Chatman* opinion, it is not applicable to the case before us. *Id.* at 323.

## II

■ In this case, the SJA's initial post-trial recommendation, which advocated approval of the sentence in full if the convening authority found it to be "warranted" and "appropriate," was provided to appellant and her defense counsel. In response, defense counsel submitted a Petition for Clemency, requesting the convening authority to "reduce the amount of . . . [appellant's] confinement as you see fit." The clemency petition referenced several attached documents, including supporting letters from friends, family, and members of the Air Force, and a statement from appellant. In the request for clemency, defense counsel cited the post-trial statements for the proposition that appellant "has been very successful in turning the experience of jail into a vehicle for maximizing her rehabilitation."

The SJA subsequently provided the convening authority with a document entitled, "ADDENDUM TO THE STAFF JUDGE ADVOCATE'S RECOMMENDATION." In the course of recommending that the convening authority reject appellant's clemency request for a reduction in confinement, the SJA stated:

> All of the matters submitted for your consideration in extenuation and mitigation were offered by the defense at trial; and the seniormost military judge in the Pacific imposed a sentence that, in my opinion, was both fair and proportionate to the offense committed.

There is no evidence in the record that the SJA served this addendum on appellant, and the Government has not contested appellant's representation that the addendum was not served.

The convening authority's final action, taken on February 6, 1995, did not grant appellant's clemency request for a reduction in confinement. Instead, the convening authority approved the sentence, subject to a modification in the period of forfeitures from 6 to 3 months as recommended by the SJA in the addendum.

## III

### A

The clear import of the SJA's addendum was that the convening authority should reject the request for clemency because "all of the matters" submitted by the defense had been considered by a judge of considerable

stature, who had adjudged a fair and proportionate sentence based, in part, on these same materials. The SJA introduced a number of new issues for the first time in the addendum, including whether the submitted materials had been considered by the military judge in arriving at his sentence; what role, if any, the military judge's stature should play in the convening authority's assessment of appellant's clemency request; and the nature of the stature of the military judge as suggested by the adjective "seniormost." These issues were introduced by the SJA for the convening authority to weigh in the balance against the request for clemency. Under such circumstances, these were new matters, and the defense was entitled to receive notice of these matters and an opportunity to respond. *See United States v. Chatman* and *United States v. Leal*, both *supra.*

### B

■ The remaining question is whether appellant is entitled to a new SJA recommendation and new action by the convening authority or whether this new matter is so "trivial" that appellant could not have been prejudiced by the additional weight that it added to the scales. In our view, the message sent by the SJA was "erroneous, inadequate, ... [and] misleading." *See Narine,* 14 MJ at 57; RCM 1106(f)(4).

The addendum was erroneous in suggesting that the matters submitted by appellant had been considered by the military judge at trial. In fact, much of the clemency package was developed after trial. It was also misleading for the SJA to imply that another decisionmaker—the military judge—had considered the same material. Given the opportunity to respond, appellant could have corrected the SJA's erroneous description of the post-trial submission and the misleading implication that flowed from it.

A further problem with the addendum is that the SJA, for the first time in this case, sought to rationalize and bolster his own recommendation as to the period of confinement by expressly invoking the persuasive weight of the judgment of the military judge. In the addendum, the SJA contended that the military judge at trial, when presented with the same information as presented to the convening authority on review, had given a sentence that was "both fair and proportionate." The initial recommendation from the SJA neither contained a similar reference to the judge imposing a "fair and proportionate" sentence nor raised the more fundamental question in that context of the relationship between the responsibilities of the military judge at trial and the responsibilities of the convening authority in the post-trial review.

The sentencing authority at trial is required to adjudge an "appropriate sentence," subject to the maximum punishment for the offense and the rules governing evidence in sentencing proceedings. *See* RCM 1001. In determining what sentence is appropriate, it is not proper to rely on the possibility of mitigating action by the convening authority. *See* RCM 1005(e)(3). The convening authority, on the other hand, is not limited to considering evidence that is admissible at a court-martial. *See* RCM 1107(b)(3)(B)(iii). The fact that the military judge has imposed a lawful and appropriate sentence does not restrain the convening authority, who "may for any or no reason disapprove a legal sentence in whole or in part...." RCM 1107(d)(1). The convening authority is directed to "approve that sentence which is warranted by the circumstances of the offense and appropriate for the accused." RCM 1107(d)(2).

If the SJA's addendum had been served on appellant and her counsel, appellant would have had the opportunity to focus the convening authority's attention on the differences between the responsibilities of the military judge and the convening authority, as well as the different types of information that could be considered. Failure to do so was inconsistent with the notice-and-response requirements of RCM 1106(f)(7).

This error was compounded by the SJA's effort to bolster further his recommendation by referring to the military judge as "the seniormost military judge in the Pacific." Assuming, as the Government contends, that the novel term "seniormost" was intended to

refer to the status of the military judge as the Chief Judge in the Pacific for the Air Force, this addition to the equation for the first time in the addendum cannot be dismissed as "trivial." The stature of the military judge played no role in the trial[1], was not mentioned by the SJA in his initial recommendation, and was not raised by appellant in her response to the recommendation. Moreover, although not necessary to our decision, we note that reference to the military judge as "seniormost" potentially was misleading because there is no requirement that the "most senior" judge or the "Chief Judge" of an Air Force circuit have any particular degree of judicial experience.[2]

The SJA's clear message to the convening authority, in effect, was as follows: A military judge of considerable stature, who considered the same materials that appellant now submits to you, adjudged a fair and proportionate sentence, and you should approve it.

### IV

Appellant was found guilty of desertion. The central issue in this case is not whether the sentence adjudged for that offense was lawful but whether applicable procedural steps were followed during post-trial proceedings involving exercise of the convening authority's broad discretion to modify an otherwise lawful sentence.

■ The convening authority has virtually unfettered power to modify a sentence in an accused's favor, including disapproval of a punitive discharge, on the basis of clemency or any other reason. Art. 60(c)(2); RCM 1107(d)(1); see United States v. Wilson, 9 USCMA 223, 226, 26 CMR 3, 6 (1958). Congress and the President have established procedures to ensure that the convening authority makes this decision on the basis of an informed recommendation by the SJA and a response by the accused. As noted at the outset of this opinion, one of the procedures established by the President to ensure that the convening authority receives a fair and accurate presentation is the requirement in RCM 1106(f)(7) that, if the SJA prepares an addendum to the recommendation that contains new matter, the accused must have notice and an opportunity to respond—just like the accused would have had if the new matter had been in the original recommendation. This requirement was not fulfilled in this case.

In the addendum, the SJA supplemented his initial recommendation by inserting new references to material not considered by the military judge, the stature of the military judge, and the sentence imposed by the military judge. The SJA's apparent belief that his recommendation needed such bolstering is understandable in the context of this case. The command had treated appellant's case with relative sympathy from the outset. Appellant's offense occurred while she was on emergency leave from Okinawa to be in the United States with her stepfather, who had suffered a stroke. He died while she was

1. At the outset of the trial, the military judge had noted as a ministerial matter that he had detailed himself to the trial in his capacity as "Chief Judge of the Pacific Circuit," but no further reference to this status was made in the trial or post-trial proceedings prior to issuance of the addendum.

2. Assuming that the term "seniormost" means "most senior," it does not necessarily bear any relationship to judicial experience. Resort to standard reference works makes it clear that the term "senior" can have a variety of meanings, including chronological age, length of service in a profession, length of service in a particular position, a person of higher rank or standing, precedence in making certain decisions, and a person accorded respect because of age. See Webster's Third New International Dictionary 2066 (1981); The Random House College Dictionary 1198 (Rev. ed.1975); The American Heritage Dictionary 1116 (2d college ed.1985 ). The applicable regulation concerning designation of the Chief Judge of a Circuit does not provide any more useful guidance. See para. 18–13a, Air Force Regulation 111–1 (12 July 1989) (simply noting that the Chief Judge is the "senior military judge who is designated as the chief judge of a circuit," leaving "senior" undefined). As a result, it is possible that a person designated as the "senior judge" might be an individual who is senior in status as a military officer but relatively inexperienced as a judge, as a criminal law specialist, or even as a judge advocate. The purpose of serving the addendum on the accused is to provide an opportunity to bring any such ambiguities to the convening authority's attention.

home. Her mother, who had other problems, persuaded her to stay past her leave date.

After remaining absent without leave, she eventually turned herself in to Air Force authorities. Although the command sought to hold her accountable for her actions, her situation apparently struck a responsive chord with the commander who convened the court-martial, who decided to treat the desertion charge as a relatively minor matter by referring it to a special court-martial rather than to a general court-martial. Recognizing the sympathetic nature of the case, the SJA altered his initial recommendation by inserting in the addendum a recommendation for reduction in forfeitures, but he relied on his references to the actions of the military judge in recommending that the sentence otherwise be approved.

The issue before us is not whether it was permissible for the SJA to prepare an addendum that sought to bolster his initial recommendation through references to the stature and actions of the military judge. The issue, which we decide in appellant's favor, involves failure to comply with RCM 1106(f)(7), under which appellant should have had an opportunity to receive notice of the new matter, along with the concomitant opportunity to respond to and correct the misleading information contained therein before the convening authority acted on appellant's clemency petition.

V

The decision of the United States Air Force Court of Criminal Appeals and the action of the convening authority are set aside. The record of trial is returned to the Judge Advocate General of the Air Force for submission to a different convening authority for action after compliance with Article 60 and RCM 1105 and 1106. Thereafter, Articles 66 and 67, UCMJ, 10 USC §§ 866 and 867 (1994), respectively, shall apply.

Chief Judge COX and Judges SULLIVAN and GIERKE concur.

CRAWFORD, Judge (dissenting):

The central issue in this case is as follows: Assuming the staff judge advocate (SJA) did not inform the convening authority about the clemency matters and did interject new matter, were these errors harmless?

Contrary to her pleas, appellant was convicted of desertion at a special court-martial. She was sentenced to a bad-conduct discharge, 5 months' confinement, partial forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence but reduced the forfeitures from a 6-month period to a 3-month period. The change was based on the recommendation of the SJA in his addendum.

The defense argues that there are two defects in the SJA's recommendation: (1) failure to direct the convening authority to consider the clemency matters, and (2) interjecting new matter by commenting on the experience of the judge. Final Brief at 3, 5. RCM 1106(f)(7), Manual for Courts-Martial, United States (1995 ed.), provides:

The staff judge advocate or legal officer may supplement the recommendation after the accused and counsel for the accused have been served with the recommendation and given an opportunity to comment. When new matter is introduced after the accused and counsel for the accused have examined the recommendation, however, the accused and counsel for the accused must be served with the new matter and given 10 days from service of the addendum in which to submit comments.

"New matter" is defined as "matter from outside the record of trial, and issues not previously discussed." *United States v. Leal,* 44 MJ 235, 236, 237 (1996) (referring to a letter of reprimand, which was not admitted at trial, to rebut the accused's clemency request was new matter); *see also* RCM 1106(f)(7), Discussion; *United States v. Jones,* 44 MJ 242, 243 (1996) (citing a regulation was not new matter but referring to key dates regarding post-trial processing was new matter, but failure to serve addendum was harmless error).

In the addendum, the SJA mentioned that Catalani had submitted matters for his con-

sideration in determining whether clemency should be granted. These matters included thirteen documents which were not submitted by appellant at trial. All thirteen documents were listed as attachments to the addendum. The SJA's statement that "[a]ll of the matters submitted for your consideration in extenuation and mitigation were offered by the defense at trial . . ." could not reasonably mean these thirteen documents because they did not exist at trial. In context, that statement could only mean that the substance of the matters presented in those documents was offered by the defense at trial. Four of the attachments to the clemency petition were directed at appellant's emotional and family problems. Five other attachments refer to her work at Dover Air Force Base, Delaware. One of the remaining documents stressed that she was a good person and another described her as a victim. The last two documents were petitions for clemency signed by defense counsel and by appellant.

Contrary to appellant's assertions, this is not a case in which clemency matters were neither submitted to nor considered by the convening authority. Indeed, this convening authority granted appellant additional relief in the form of reduction of forfeitures. While the SJA could have been more precise in his description of the clemency matters submitted by appellant, the significance of all these documents pales in comparison to her conduct described in detail in the stipulation of fact attached to this opinion as an appendix. No one questioned her work performance at Dover. Even she said that she would be much happier if she was back at Dover AFB with her boyfriend. However, in today's armed forces, with emphasis on rapid deployment for peacekeeping and armed action, a servicemember cannot choose where he or she would like to be stationed. In any event, when one examines the unit's efforts to return her to Okinawa after her unauthorized absence and the reduction of the partial forfeitures already granted by the convening authority, it is unlikely in my view that appellant would receive any further relief. Thus, I can only conclude that any error in failing to serve the addendum was harmless.

APPENDIX

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | STIPULATION OF FACT |
| | ) | |
| A1C VICTORIA A. CATALANI | ) | |
| 18th Munitions Squadron | ) | |
| Kadena AB, Okinawa Japan | ) | |

It is hereby stipulated by and between trial counsel and defense counsel, with the express consent of the accused, that the following facts are true:

1. At all times relevant to the charges and specifications in this case, the accused, Victoria A. Catalani, was on continuous active duty in the United States Air Force, holding the rank of Airman First Class, assigned to the 18th Munitions Squadron and stationed at Kadena Air Base in Okinawa, Japan.

2. On or about 9 September 1994, MSgt Berg, 18 MUNS First Sergeant, received notification that A1C Catalani's step-father had been hospitalized due to a "stroke." He offered her emergency leave. She said she needed only 14 days because she was not close to her family and did not need to stay too long. She was authorized leave from 9 September 1994 until 22 September 1994. On 10 September, she departed the area on emergency leave.

3. Her step-father died on 14 September 1994. A1C Catalani became depressed and over-ate. She went to her mother's house on 20 September 1994, and stayed there most of the time she was gone. A1C Catalani did not return to her organization unit, or place of duty on 22 September 1994 when her leave expired. After that date, she had no authority to be absent; her mother knew she was there and that she was wanted by the military. A1C Catalani told her mother not to turn her in because she wanted to stay home with her mother, and her mother wanted her to stay as well. A1C Catalani's mother told everyone that called her house that A1C Catalani was not there, when in fact she was.

4. On 23 September 1994, Msgt Berg, the 18 MUNS First Sergeant, called the emergency number that A1C Catalani had provided. It was A1C Catalani's aunt's house. Her aunt said to call A1C Catalani's mother, who related that A1C Catalani was staying at the L&M Motel. Lt Torkelson called the L&M Motel and no one answered the telephone. Lt Torkelson left messages at A1C Catalani's mother's house and at A1C Catalani's aunt's house to have her contact her unit as soon as possible.

5. On 26 September 1994, MSgt Berg called the L&M Motel and found that A1C Catalani was not registered there. MSgt Berg called A1C Catalani's mother again and her mother said she was out to dinner and not available. MSgt Berg left a message to have her call the unit as soon as possible.

6. On 27 September 1994, Msgt Berg again called A1C Catalani's mother's house and was told that A1C Catalani's whereabouts were unknown. Msgt Berg left a message for A1C Catalani to call as soon as possible. Finally A1C Catalani called and spoke with Lt Torkelson. A1C Catalani asked for an extension to her leave that had expired 5 days earlier. Lt Torkelson denied her extension and directed her to get on the next available plane to Okinawa. Lt Torkelson also directed her to call with flight information as soon as possible.

7. On 28 September 1994, Msgt Berg called A1C Catalani's mother's house. A1C Catalani's mother told him that the member was at the L&M Motel. Lt Col Miller then called the L&M Motel and spoke to A1C Catalani. He told her to make travel arrangements then call with her flight information.

8. On 29 September 1994, A1C Catalani called Kadena and related that she would be landing at the Naha International Airport on a United flight at 10:15 on Friday, the 30th of September. She did not arrive.

9. On 3 October 1994, Lt Torkelson called A1C Catalani's mother's house again and A1C Catalani was still there. A1C Catalani said she missed the flight due to bad traffic. She said that she would catch a flight the next day. Lt Torkelson reminded A1C Catalani that she was AWOL and that she must call back with details of her travel arrangements.

10. On 4 October 1994, Lt Col Miller called A1C Catalani's mother's house and A1C Catalani was still there. A1C Catalani said that she left too late to make the plane. He then reminded her that she was AWOL and needed to return as soon as possible.

11. On 4 October 1994, Lt Torkelson called TMO at Travis AFB, and spoke to SSgt Brown, who told her that the Security Police would give A1C Catalani a provisional pass since the member was AWOL; A1C Catalani had previously told him that her leave had been extended. Lt Torkelson then called A1C Catalani and told her to go to the front gate at Travis AFB and identify herself; they would provide her with a provisional pass, and arrange her transportation back to Kadena AB. A1C Catalani agreed to go there as soon as she got off the telephone.

12. On 6 October 1994, Lt Col Miller called A1C Catalani's mother's house and her mother said that she was supposed to have already left. Lt Torkelson called Travis terminal to see if the member had departed on the plane; she had not. Lt Torkelson had A1C Catalani paged at the terminal, but no one responded to the page. Lt Torkelson called the LE desk at Travis and learned that A1C Catalani did not come and pick up her provisional pass. Lt Torkelson then called the LE desk at Kadena AB and requested them to initiate action to have Travis AFB take her into custody and return her to Kadena AB.

13. On 7 October 1994, Lt Torkelson called LE Desk again and found that A1C Catalani had not yet been located.

14. On 8 October 1994, Lt Col Miller called member's mother, who said she did not know where her daughter, A1C Catalani was.

15. On 11 October 1994, Lt Torkelson called the Law Enforcement Desk at Travis AFB and learned that A1C Catalani had not arrived like she said she would. They said that they would provide points of contact to A1C Catalani's mother. Lt Torkelson then called A1C Catalani's mother, who said that she did not know where A1C Catalani was.

16. On 19 October 1994, A1C Catalani still had not arrived or contacted military authorities. A1C Catalani's mother said that Travis security police officers had been to her house and provided her with the necessary information to contact the SPs at Travis AFB.

17. On 24 October 1994, A1C Catalani still had not contacted the military authorities. Her status was changed from AWOL to Deserter.

18. On 28 November 1994, A1C Catalani returned to military control at Travis AFB. Her mother feared being prosecuted for harboring a fugitive. A1C Catalani was provided commercial airline tickets and returned to Okinawa. Lt Torkelson, her section commander, and Captain Youell, her OIC, picked her up at the Naha International Airport. They transported her to 18 SPS/SPOI for an interview.

19. SSgt Michael P. Hagans of 18 SPS advised A1C Catalani of her rights in accordance with Article 31 UCMJ, and she recorded her responses on an AF Form 1168. A1C Catalani chose to waive her rights, declined counsel, and affirmatively agreed to an interview. SSgt Hagans began the interview, but soon left the room. SrA Angela R. King continued the interview.

20. During the interview, A1C Catalani said that she had originally told MSgt Berg that she only needed 14 days' leave, as she was not close to her family. SrA King states that A1C Catalani told her that she left Okinawa on 10 September 1994, and when she got on the plane to go home, she planned on never returning to Okinawa. She said that she stayed with her mother after 20 September 1994. She added that her mother knew she was there the entire time that people from Kadena AB were calling for her, but her mother was "covering" for her. She told her mother not to turn her in. When people called her mother's house looking for her, her mother would tell them that A1C Catalani was not there, when in fact she was. A1C Catalani related that she did not like Okinawa, and that she wanted to be at Dover AFB with her boyfriend. She said that she never really tried to return to Okinawa the day she had claimed that traffic prevented her from catching her flight. Again she said she never intended to return to Okinawa. She related that she did not like Okinawa. She said she had been thinking about going AWOL for awhile and decided that this was her chance.

David J. DiCenso, Capt, USAF
Trial Counsel

13 Dec 94
Date

Tony R. Roberts, Capt, USAF
Assistant Trial Counsel

13 Dec 94
Date

Jennifer J. Snider, Capt, USAF
Area Defense Counsel

13 Dec 94
Date

Victoria A. Catalani, A1C, USAF
Accused

13 DEC 94
Date