# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————

### No. ACM 38873

————————

### UNITED STATES
*Appellee*

**v.**

### Michael J. TURPIANO
Major (O-4), U.S. Air Force, *Appellant*

————————

Appeal from the United States Air Force Trial Judiciary

Decided 24 May 2018

————————

*Military Judge:* Vance H. Spath (trial and *DuBay* hearing).

*Approved sentence:* Dismissal, confinement for 3 months, forfeiture of
$7,353.00 pay per month for 3 months, and a reprimand. Sentence adjudged 16 January 2015 by GCM convened at Joint Base San Antonio-Lackland, Texas.

*For Appellant:* Major Mark C. Bruegger, USAF; Terri R. Zimmermann,
Esquire; Jack B. Zimmermann, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Matthew L. Tusing, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, JOHNSON and SPERANZA, *Appellate Military
Judges.*

Chief Judge MAYBERRY delivered the opinion of the Court, in which
Senior Judge JOHNSON and Judge SPERANZA joined.

————————

**This is an unpublished opinion and, as such, does not serve as
precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————

MAYBERRY, Chief Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of assault consummated by a battery by touching the breast of Second Lieutenant (2d Lt) RH and touching the mid-section of 2d Lt CE, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[1] The adjudged and approved sentence consisted of a dismissal, confinement for three months, forfeiture of $7,353.00 pay per month for three months, and a reprimand.

Appellant alleges: (1) the findings of guilt are factually insufficient; (2) trial counsel (TC) committed reversible error by failing to disclose favorable information; (3) the Addendum to the Staff Judge Advocate Recommendation (SJAR) and subsequent action by the convening authority (CA) are defective; (4) the military judge gave an erroneous mistake of fact instruction as to the offense involving 2d Lt RH; (5) the military judge erroneously instructed the members that they "must convict" if they believed the Government proved its case;[2] (6) the military judge gave an erroneous instruction on witness credibility; (7) Appellant was deprived of his constitutional right to effective assistance of counsel;[3] (8) the sentence is inappropriately severe; (9) the military judge erred in allowing the members to consider an unsworn statement from 2d Lt RH at sentencing; and (10) there was excessive post-trial delay.[4]

As to the third issue, we agree that the Addendum to the SJAR and subsequent action by the CA are defective and this error prejudiced a substantial right of Appellant. We remand for new post-trial processing.

---

[1] Appellant was acquitted of rape and assault consummated by a battery of Ms. KP and assault consummated by a battery of 2d Lt DC.

[2] Raised, in part, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Consistent with our superior court's decision in *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017), we find that, absent objection at trial, the instruction did not constitute plain error.

[3] Assignments of Error 6 and 7 are raised pursuant to *Grostefon*.

[4] Because of our decision to remand this case for new post-trial processing, we defer consideration of Appellant's request for excessive post-trial delay relief under Article 66(c), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(c), and *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002).

## I. BACKGROUND

Appellant was a prior enlisted Airman who later received his commission through Officer Training School. The charges arose during the timeframe when Appellant, as well as the complaining witnesses, were students at the Basic Intelligence Officer's Course (BIOC) at Goodfellow Air Force Base (AFB), Texas. The course ran from September 2012 to April 2013. The BIOC had hundreds of students, split into day and night shift classes. Appellant was the class leader for his night shift class. His class was comprised of approximately 18 students, half of whom had active duty experience, the other half being recent college graduates.

In January 2013, Appellant started dating a day shift civilian student, Ms. KP. Their dating quickly transitioned to a non-exclusive sexual relationship, but this lasted only a few weeks. Soon thereafter, Ms. KP alleged that Appellant had raped her and assaulted her on a separate occasion.

It was common for the BIOC students to socialize together after class, including going to local bars. On one evening in late January 2013, Appellant danced with a fellow student in the course who was not in his class, 2d Lt RH, at a "hip hop" club in town. The style of dancing was described as "dirty dancing" or "grinding." This dancing is sexually charged; 2d Lt RH described "grinding" as follows:

> Whether your back is to someone's chest, or you're face to face, it is when you put your -- are in contact with each other's groin areas. I mean, your entire torso is touching the entire back of someone, down from torso to butt and torso to groin. Or both of you have your bodies touching each other and your legs are in between each other's so that your groins are relatively close.

She testified that this is the way she was dancing with Appellant on the evening in question, and clarified that it was, "genital region to buttocks contact." In other words, it was uncontested that 2d Lt RH consensually rubbed her buttocks against Appellant's groin during the dancing on that night. 2d Lt RH did not make any complaint that Appellant had assaulted her to the bar staff or owners, or civilian or military law enforcement, that evening or in the months that followed.

In April 2013, the Air Force Office of Special Investigations (AFOSI) began an investigation into Ms. KP's rape allegation against Appellant. During the investigation, AFOSI agents interviewed approximately 50 witnesses, all of whom were BIOC students. It was during 2d Lt RH's four-hour interview on 5

April 2013 that she first disclosed Appellant had "grazed" her breast while dancing.

Similarly, during the extensive AFOSI interviews regarding the alleged rape of Ms. KP, another prior service student, 2d Lt CE, alleged for the first time that in early March 2013, Appellant approached her from behind and put his hands around her mid-section without her permission as she talked with a friend at a local bar.

## II. Discussion

### A. Factual Sufficiency

Appellant challenges the factual sufficiency of the evidence of both assault consummated by battery convictions. With regard to 2d Lt RH, he contends that there was evidence of accident, consent, and mistake of fact. With regard to 2d Lt CE, he contends that the evidence does not support a finding of guilt beyond a reasonable doubt. Each assertion will be discussed individually.

#### 1. Law

We review issues of factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of factual sufficiency is limited to the evidence presented at trial. *United States v. Wheeler,* 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *aff'd*, ___ M.J. ___, No. 17-0456, 2018 CAAF LEXIS 177 (C.A.A.F. 22 Mar. 2018). We "cannot find as fact any allegations of which the accused was found not guilty at trial." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

The test for factual sufficiency "is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, *the members of the service court are themselves convinced of appellant's guilt beyond a reasonable doubt.'*" *Rosario*, 76 M.J. at 117 (quoting *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011)); *see also United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

"In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)). Just as with legal sufficiency, "[t]he term reasonable doubt . . . does not mean that the evidence must be free

from conflict." *Id.* (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

**2. Analysis**

*a. Appellant's actions while dancing with 2d Lt RH.*

2d Lt RH met Appellant at the end of January 2013 when both of them were at a local bar with separate groups of friends. During the course of the night, 2d Lt RH was on the dance floor when she felt someone behind and up against her, with their chest touching her back. She did not know who it was initially. After determining it was Appellant, 2d Lt RH engaged in consensual "dirty dancing" and "grinding" with Appellant. During the dance, their bodies were very close to and touching each other.

2d Lt RH testified at trial in January 2015 that during the dance, Appellant "cupped" her breast with his hand, "gripping" it and applying "pressure." This was inconsistent with her description to AFOSI in April 2013 that Appellant "briefly grazed" her breast, but did not mention cupping.[5]

Appellant took the stand in his own defense and specifically denied touching 2d Lt RH's breast in the way that she described during her testimony. On cross-examination, Appellant testified that he might have "grazed" her breast as they were dancing, but he did not grab or cup her breast as she alleged at trial. Appellant stated that even in the club atmosphere, based on the fact that he had just met 2d Lt RH that night, it would have been wrong for him to have touched 2d Lt RH's breast as she described it. Appellant testified that he may have "grazed" or touched her breasts due to the close distance between them during the dance and if this happened, he did not do it purposely.

2d Lt RH did not report that Appellant had assaulted her until her 5 April 2013 interview with AFOSI regarding the alleged rape of Ms. KP. In fact, when she did make her statement to AFOSI, she told them that she "blew off the incident because it's not uncommon at the dance clubs for touching to occur." The military judge instructed the members regarding accident, mistake of fact as to consent, and prior inconsistent statements by 2d Lt RH.

As charged, the Government needed to prove: (1) Appellant did bodily harm to 2d Lt RH (by touching her breasts, thighs, and mid-section); and (2) the

---

[5] Appellant was charged with touching 2d Lt RH on her breast, thighs, and mid-section. The members found him not guilty of touching her thighs and mid-section, both of which were alleged to have happened after he touched her breast.

bodily harm was done with unlawful force or violence. *Manual for Courts-Martial, United States* (2012 ed.) (*MCM*), pt IV, ¶ 54(b)(2). Bodily harm means "any offensive touching of another, however slight." *Id.* at ¶54(c)(1)(a).

Appellant did not contest that he touched 2d Lt RH's breast, thigh, and mid-section while dancing, and in that order, but avers that it was accidental or with her consent.

The credibility of the witnesses was initially an issue for the members to decide and which we evaluate on appeal. Appellant's reliance on these events not being immediately reported does not negate the fact that when questioned by law enforcement on a separate matter, 2d Lt RH did report it. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### b. "Hugging" of 2d Lt CE.

2d Lt CE was married and socialized infrequently with her classmates. She testified that Appellant called her "pet" names such as "honey" or "sweetie," and that she had told him to stop calling her by those names. 2d Lt CE alleged that while she was speaking with a friend in the "smokepit" of a local bar, Appellant grabbed her from behind and pulled her towards him. During the course of this maneuver, she turned around and was facing Appellant with his hands clasped behind her back. She removed his hands stating, "I'm married." Appellant again placed his hands around her stating, "It doesn't mean anything," and 2d Lt CE again removed his hands and stated, "It does when you're married."

Appellant's direct testimony at trial did not address this allegation, but on cross-examination he stated "I never wrapped my arms around how she describes," but went on to state "if I did . . . that would be wrong." Trial defense counsel did not ask any questions about this event on re-direct; he later indicated in his declaration that despite spending countless hours preparing for trial, Appellant changed his story with regard to this incident on the stand.[6]

Unlike the incident involving 2d Lt RH, Appellant did not claim it was an accident or that he had a mistaken belief that 2d Lt CE consented to him touching her.

The credibility of the witnesses was initially an issue for the members to decide and which we evaluate on appeal. Appellant's reliance on these events

---

[6] This issue will be further explored later in this opinion.

not being immediately reported does not negate the fact that when questioned by law enforcement on a separate matter, 2d Lt CE did report it. Furthermore, Appellant's assertion that "a single friendly hug from behind would be insufficient to secure a conviction" is erroneous. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Discovery

### 1. Facts[7]

On 6 April 2013, AFOSI interviewed then-2d Lt KW,[8] another BIOC student in Appellant's night class. 2d Lt KW was relatively new to the military and had no prior contacts with law enforcement. At the beginning of his interview, he did not know why he was being interviewed or that Appellant was the subject of the investigation. After the interview, the specifics of which will be discussed below, 2d Lt KW provided an 11-page written sworn statement to AFOSI. This statement was included in the Report of Investigation (ROI).

Shortly after his AFOSI interview, 2d Lt KW contacted his family and conveyed he was extremely upset about his treatment by AFOSI. His aunt, also on active duty in the Air Force, reached out to a friend who was an Air Force judge advocate, Colonel (Col) DV, and asked if her nephew could contact Col DV regarding his experience with AFOSI. Col DV agreed to talk to 2d Lt KW in her personal capacity as the nephew of a friend, not as a military attorney. 2d Lt KW called Col DV, still extremely upset, indicating the AFOSI special agent (SA) had threatened his career; he felt the statement he had provided needed to be fixed because it did not reflect what he wanted to say, but rather what AFOSI wanted it to say; and if this is how the Air Force treated people, he wanted to get out. Col DV attempted to calm 2d Lt KW down, assuring him that he would have a chance to explain his statement, probably more than once, and repeatedly emphasizing that the "system works." Col DV did not know the specific facts of the interview, but knew that 2d Lt KW was upset because he felt he was "manhandled at the [AF]OSI and treated like he was a criminal,

---

[7] These facts were obtained during the post-trial hearing in accordance with *United States v. DuBay,* 37 C.M.R. 411, 413 (C.M.A. 1967), ordered by this court on 24 May 2017. Unless otherwise indicated, these facts are based on the military judge's findings of fact.

[8] By the time of the *DuBay* hearing, KW was a Captain. He will be referred to as 2d Lt KW throughout this opinion.

and he didn't understand why there was so much hostility or aggression towards him."

Prior to the Article 32, UCMJ, 10 U.S.C. § 832, hearing which was held on 30 September 2014, Government counsel telephonically contacted 2d Lt KW to interview him regarding his statement. According to 2d Lt KW, he informed the counsel that his statement was not accurate, he had no recollection of the contents of the statement, and he was upset as to how he was treated by AFOSI. At the *Dubay* hearing, 2d Lt KW testified that when the Government counsel interviewed him, their tone went from friendly to agitated and as a result, all of the memories of the AFOSI incident came back in a bad way. In an effort to refresh his recollection, the Government counsel e-mailed 2d Lt KW a copy of his statement and contacted him again. During the second conversation with them, 2d Lt KW indicated there were issues with the reliability of his statement and he wanted no part in the proceedings. No member of the Government notified Appellant's defense counsel of their interactions with 2d Lt KW.

After the first phone call with the Government counsel, 2d Lt KW went to see his supervisor, Lieutenant Colonel (Lt Col) EM, and "lost it." Lt Col EM also testified at the *DuBay* hearing and stated that he found 2d Lt KW to be deeply troubled by the event and procedures which 2d Lt KW described as "harshly interrogated." Lt Col EM testified further that 2d Lt KW likened AFOSI with using coercive tactics of the type used on prisoners of war, and that 2d Lt KW felt as though he was "broken" during the interrogation. Lt Col EM characterized 2d Lt KW's description of the incident as not involving a lot of specific details, but to the effect that 2d Lt KW was mistreated by AFOSI; that he made a statement that was inaccurate, but felt he was forced to make and sign the statement nonetheless; and that 2d Lt KW attempted to disavow the statement. While Lt Col EM could not say with certainty that 2d Lt KW used the word "coerced," he believed 2d Lt KW did, and even if 2d Lt KW did not, Lt Col EM's takeaway from the conversation was that he was coerced. Finally, Lt Col EM indicated he did not speak to anyone else about his discussion with 2d Lt KW because he felt, or assumed, the matter was being addressed because it involved a court proceeding. Lt Col EM interpreted the fact that he was being asked at the *DuBay* hearing whether he spoke to anyone else about the information that 2d Lt KW had conveyed to him as indicating that the issue had not been otherwise addressed.

During the telephonic interviews of 2d Lt KW, the assistant trial counsel (ATC) recalled writing 2d Lt KW's name at the top of a sheet of paper, but made no additional notations. The ATC did not know what had become of that

piece of paper. Further, the ATC was certain that a paralegal was present for both telephone interviews who might have taken notes. The ATC characterized 2d Lt KW as "disrespectful and combative" or "irritated or upset." TC was fairly certain there was no paralegal present for either interview and denied 2d Lt KW was combative or disrespectful. TC did not recall 2d Lt KW's demeanor outside the ordinary, stating he was "as unpleased as most witnesses are when they are called by a JAG." No interview notes were produced from the Government telephone interviews with 2d Lt KW.

The military judge found 2d Lt KW to be a credible witness. Additionally, he found 2d Lt KW's statement to AFOSI contained rumor, erroneous information, and details supplied by AFOSI. 2d Lt KW lacked direct knowledge of numerous facts contained within the statement, but made an effort to comply with AFOSI's direction and included anything he knew, believed, or had ever heard about Appellant. Furthermore, the military judge found 2d Lt KW consistently informed people about his concerns regarding his treatment by AFOSI; that his statement to AFOSI had inaccuracies; that it was something he was required to give; and that he wanted to fix it or retract it.

The military judge found that while the conversation between 2d Lt KW and the prosecutors happened quickly and did not seem significant to them, based on the facts of the case, and the impact by AFOSI on gathering evidence, the information would have been important to the Defense team. Ultimately, the military judge found that "[b]ased on the unique issues in the case (the AFOSI conduct), and the importance of the information to both motion practice, and potentially findings, the government did fail to meet its discovery obligations with respect to the circumstances of [2d Lt] KW's AFOSI interview."

The CA's affidavit provided at the *DuBay* hearing stated:

> If it is true that AFOSI mistreated an officer and that mistreatment resulted in an inaccurate statement from the witness, and that witness was a sober eyewitness to the offenses [Appellant] was convicted of and would have testified that he did not see the crimes take place, and the members did not hear this testimony, that may have affected the action I took in this case.

### 2. Law

"Our review of discovery/disclosure issues utilizes a two-step analysis: first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on the appellant's trial." *United States v. Roberts,* 59 M.J. 323, 325 (C.A.A.F. 2004). As a result, we have established two

categories of disclosure error: (1) "cases in which the defense either did not make a discovery request or made only a general request for discovery[;]" and (2) cases in which the defense made a specific request for the undisclosed information. *Id.* at 326–27. For cases in the first category, we apply the harmless error standard. *United States v. Hart*, 29 M.J. 407, 410 (C.M.A. 1990) (citation omitted); *see United States v. Behenna*, 71 M.J. 228, 238 (C.A.A.F. 2012) ("Once a *Brady* violation is established, courts need not test for harmlessness.") (citing *Kyles v. Whitley*, 514 U.S. 419, 435-436 (1995)). For cases in the second category, we apply the heightened constitutional harmless beyond a reasonable doubt standard. *Roberts*, 59 M.J. at 327 (citing *Hart*, 29 M.J. at 410). Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial. *See Hart*, 29 M.J. at 409 (dictum).

"The Due Process Clause of the Fifth Amendment guarantees that criminal defendants be afforded a meaningful opportunity to present a complete defense." *United States v. Webb*, 66 M.J. 89, 92 (C.A.A.F. 2008) (citation and internal quotation marks omitted). That guarantee requires the prosecution to disclose to the defense evidence favorable to an accused where the evidence is material either to guilt or to punishment. *Id.* (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). To determine whether evidence, including impeachment evidence, is "material" to guilt or punishment, the court must evaluate whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Mahoney*, 58 M.J. 346, 349 (C.A.A.F. 2003)). A "reasonable probability" evaluates "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial." *Id.*

Furthermore, the defense counsel is entitled to rely on a prosecutor's representation that *Brady* information does not exist or has been disclosed. *See Strickler v. Greene*, 527 U.S. 263, 283 n.23 (1999) ("*[I]f a prosecutor asserts that he complies with Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the state is constitutionally obligated to disclose under *Brady*."); *see also United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (quoting *Hughes v. Hopper*, 629 F.2d 1036, 1039 (5th Cir. 1980)) ("[D]efense counsel's knowledge of the [evidence is] effectively nullified . . . when a prosecutor . . . misleads the defense into believing the evidence will not be favorable to the defendant.").

Article 46, UCMJ, 10 U.S.C. § 846, establishes the right of an accused to obtain favorable evidence. This statute is implemented in Rules for Courts-

Martial (R.C.M.) 701–703. R.C.M. 701 details the liberal discovery practice in courts-martial and sets forth the rights and corresponding obligations of the parties. It is well-established that "Article 46 and its implementing rules provide greater statutory discovery rights to an accused than does his constitutional right to due process." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) (citing *Roberts*, 59 M.J. at 327).

Discovery practice under Article 46, UCMJ, and R.C.M. 701 "promote[s] full discovery . . . eliminate[s] 'gamesmanship' from the discovery process[ ]" and is "quite liberal . . . . Providing broad discovery at an early stage reduces pretrial motions practice and surprise and delay at trial." 2002 *MCM*, App. 21, at A21–32. The military rules pertaining to discovery focus on equal access to evidence to aid the preparation of the defense and enhance the orderly administration of military justice. To this end, the discovery practice is not focused solely upon evidence known to be admissible at trial. *See United States v. Stone*, 40 M.J. 420, 422 (C.M.A. 1994) (citing *United States v. Lloyd*, F.2d 348, 351 (D.C. Cir. 1993)).

Of particular importance in this case are the Government's duties concerning disclosure of information requested by the Defense that is within the possession, custody, or control of the Government, and material to the preparation of the Defense, and evidence favorable to the defense. R.C.M. 701(a)(2)(A) and (a)(6).

### 3. Analysis

We agree with the military judge's finding that the Government failed to meet its discovery obligations with respect to the circumstances of 2d Lt KW's AFOSI interview. We note at the outset that even if trial counsel were not previously aware of some of the tactics used by AFOSI in gathering evidence in this case, after their conversations with 2d Lt KW, it would have become known to them. As the United States Supreme Court restated in *Strickler*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." 527 U.S. at 281.

It is important to emphasize that the military judge found a discovery violation, but not a *Brady* violation. As such, while he found the information at issue to be favorable, he did not find disclosure to be constitutionally required. The information was material to the preparation of the Defense, to include the formulation of defense strategy. We agree and therefore analyze whether the failure to disclose the information was harmless error.

To do so, this court must decide whether, in the absence of disclosure of the Government's additional knowledge regarding the context and content of 2d Lt KW's statement to AFOSI, Appellant "received a fair trial"—in other words, whether the failure to disclose "undermines confidence in the outcome of the trial." *Webb,* 66 M.J. at 92 (citation omitted); *United States v. Oruche*, 484 F.3d 590, 597 (D.C. Cir. 2007) (quoting *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996)) ("Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict."); *Cuffie*, 80 F.3d at 518–19 (remanded for a new trial based on a *Brady* violation even though "the remaining evidence standing alone would have been sufficient to convict . . . ."); *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996) ("As the Court made clear in *Kyles*, the test for materiality is *not* a sufficiency-of-the evidence test.").

Both the civilian (Mr. MW) and military (Captain (Capt) MAV) trial defense counsel testified at the *DuBay* hearing that had they known about 2d Lt KW's allegations against AFOSI, it would have impacted their trial strategy. They believed it would have strengthened their unlawful command influence (UCI) and Article 13, UCMJ, 10 U.S.C. § 813, motions. Finally, Capt MAV testified that he would "find it hard to believe how it wouldn't have affected the outcome of [Appellant's] trial . . . ." We are not persuaded. The UCI motion focused on UCI in sexual assault cases generally[9] and as applied to this case specifically (actions by commands at both Goodfellow AFB and Joint Base Lackland-San Antonio). There is no reference to action by AFOSI. The motion listed 11 witnesses[10] and two documentary pieces of evidence. None of the documents were offered, and only Appellant testified. The military judge held that the Defense had not met its burden of establishing "some evidence" to support the claim of actual or apparent UCI. Additionally, the military judge held that the Defense had put forth no evidence demonstrating that the preferral authority, Special Court-Martial Convening Authority, or General Court-Martial Convening Authority were "either themselves improperly influenced or pressured or improperly influenced or pressured others regarding this case."

The Article 13, UMCJ, motion alleged the no contact orders given to Appellant and AFOSI's intimidation of witnesses amounted to pretrial punishment.

---

[9] Statements made by the President of the United States, the Secretary of Defense, and the Chief of Staff of the Air Force.

[10] We note one of the named witnesses was then-First Lieutenant (1st Lt) KW, with contact information for him in Florida.

One witness, Capt DC, testified about the "intimidation" he felt and the fact that he was threatened with perjury in response to his opinion that Appellant was a good officer and role model. Capt DC indicated there was no particular line of questioning, rather AFOSI characterized Appellant as a "dirtbag" and wanted Capt DC to tell the agents everything possible that could be damaging to Appellant. Later, AFOSI informed Capt DC that Appellant had been accused of rape and did not deserve to wear the uniform. At that point, Capt DC backed down quickly from characterizing Appellant as a good officer. Ultimately, AFOSI's tactic of accusing Capt DC of covering for Appellant, along with other factors, "shaped his perspective of events" and he determined he did not want to testify on Appellant's behalf.[11] The military judge found Capt DC credible, and articulated on the record the fact that he believed AFOSI's treatment was wrong. Nevertheless, he denied the motion based on the absence of any evidence of an intent to punish Appellant.

Based on the facts before us we find no reasonable probability that the evidence 2d Lt KW could have provided would have changed the results of the proceeding. The evidence would not have materially altered the evidence regarding UCI or pretrial punishment. As to findings, although 2d Lt KW could have provided testimony as a sober witness to the incidents involving both 2d Lts CE and RH, based on the Defense strategy, calling 2d Lt KW to say he did not see Appellant hug 2d Lt CE would not have assisted the defense, and in light of Appellant's testimony that he may have touched 2d Lt RH's breast while dancing, it is not likely that 2d Lt KW's testimony that he did not see it would have impacted the findings. Finally, as to sentencing, 2d Lt KW did see Appellant interact with both victims during the remaining weeks of the course, after all of the events giving rise to the charges occurred, and could have provided evidence that they did not exhibit any adverse impacts. Evidence of this nature was provided to the members. As such, we do not condone the actions by the Government, but find no relief is warranted.

While we are troubled by the Government's overall handling of the discovery regarding 2d Lt KW before, during, and after trial, we are equally concerned by the inaction taken by trial defense counsel to independently discover the full extent of the AFOSI treatment of witnesses, as will be discussed below.

---

[11] These facts only became known to trial defense counsel after Capt DC had travelled for the trial and he was interviewed by trial defense counsel after the conclusion of the first day of trial.

## C. The Addendum to the SJAR and the CA Action

### 1. Background

The military judge found that the Government's decision to discuss the results of its inquiry into Appellant's discovery violation allegations with the convening authority while failing to address this inquiry in the SJAR Addendum constituted "new matter" pursuant to R.C.M. 1106(f)(7). The Government does not concede this amounts to new matter, but asserts that even if it were new matter, there is no prejudice to Appellant. We find the SJA's decision to inform the CA of the results of the inquiry introduced "additional matter" from outside the record, adverse to Appellant and not chargeable to Appellant's knowledge, which required notification to the Defense and an opportunity to respond pursuant to R.C.M. 1107(b)(3)(B)(iii). Furthermore, we find prejudice; the declaration from the CA at the *DuBay* hearing asserted that if the facts alleged in the clemency request regarding 2d Lt KW were true, it may have affected the action he took in this case.

### 2. Law

Proper completion of post-trial processing is a question of law which we review de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). "[A]n appellate court may determine if the accused has been prejudiced by testing whether the alleged error has any merit and would have led to a favorable recommendation by the SJA or corrective action by the convening authority." *United States v. Green*, 44 M.J. 93, 95 (C.A.A.F. 1996). Because of the highly discretionary nature of the CA's action on a sentence, we grant relief if Appellant presents "some colorable showing of possible prejudice" affecting his opportunity for clemency. *Kho*, 54 M.J. at 65 (quoting *United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998)).

R.C.M. 1107(b)(3)(B) provides that before taking action the CA may consider, in addition to the record of trial, the accused's personnel records, and the matters required by R.C.M. 1107(b)(3)(A), "[s]uch other matters" as the CA deems appropriate, provided that "if the convening authority considers matters adverse to the accused from outside the record, with knowledge of which the accused is not chargeable, the accused shall be notified and given the opportunity to rebut."

### 3. Analysis

The information provided to the CA was adverse to Appellant and from outside the record. Pursuant to RCM 1107(b)(3)B)(iii), Appellant must have been notified and given an opportunity to rebut such information. *See United*

*States v. Catalani*, 46 M.J. 325, 326 (C.A.A.F. 1997). Had the fact that an inquiry or investigation into the allegations raised by Appellant, as well as the result of that inquiry, been served on the Defense, Appellant would most definitely have taken the opportunity to comment. The documents provided by Appellant in pleadings to this court as well as the testimony of witnesses at the *DuBay* hearing amount to rebuttal to which the CA was never privy. *See United States v. Cornwell*, 49 M.J. 491 (C.A.A.F. 1998), *United States v. James*, 2007 CCA LEXIS 80 (A.F. Ct of Crim. App., 16 Feb. 2007) (unpub. op).

Our analysis focuses on prejudice. The totality of the facts and circumstances establish that Appellant's opportunity for clemency was affected. The Government conducted an inquiry as to the issue involving 2d Lt KW's pretrial statements to trial counsel as well as the underlying actions surrounding his sworn statement to AFOSI, and then failed to mention this in the SJAR Addendum or otherwise provide notice to Appellant prior to the CA taking action. This is a violation of the due process afforded to Appellant at post-trial review.

"If a military member's offenses are deemed serious enough to warrant court-martial, they are serious enough to demand the time needed to carefully and correctly shepherd each aspect of the case to conclusion." *Parker*, 73 M.J. at 922. Appellant's case was a particularly high-visibility matter. It is not unreasonable to expect that careful attention would be provided in the post-trial processing of such a case. Such was not the case here. We therefore deem it appropriate to afford Appellant the full opportunity to which he is entitled to seek clemency, and to provide the servicing legal office another opportunity to correctly process this case.

## D. Effective Assistance of Counsel

### 1. Facts

Appellant alleges his trial defense counsel were ineffective for a number of reasons, specifically including failure to investigate and present potential defense witnesses and failure to prepare Appellant to testify.[12] We ordered Appellant's trial defense counsel to provide declarations addressing Appellant's specific allegations. Appellant's trial defense counsel provided independent declarations, which were accepted by the court. These responses resulted in

---

[12] In addition to the specific claims addressed in this opinion, we considered all other issues raised by Appellant in his declarations and briefs pursuant to *Grostefon*, 12 M.J. 431. We reject those remaining issues, which require no additional analysis nor warrant relief. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

conflicting factual assertions surrounding the allegations. In response, we remanded the case for a *DuBay* hearing pursuant to *United States v. Ginn,* 47 M.J. 236, 242–43 (C.A.A.F. 1997).

Mr. MW was hired by Appellant shortly after the AFOSI investigation began in April 2013. Capt MAV was individually requested and detailed to the case prior to the Article 32, UCMJ, hearing in the fall of 2014. Both counsel remained on the case through trial, and Capt MAV remained on the case through clemency. The defense strategy was specifically focused on defending and gaining an acquittal on the sexual assault charge involving Ms. KP. The Defense felt they had a strong case in that regard. As for the assault consummated by a battery charges, the defense strategy was a combination of asserting the conduct was consensual, did not happen, or was being exaggerated.

Both trial defense counsel indicated that they were aware of more than one military member interviewed by AFOSI alleging they were mistreated during those interviews. Nevertheless, they did not interview the vast majority of the other individuals named in the ROI and they never interviewed 2d Lt KW. Four witnesses whom the Defense *called* at trial were never interviewed by trial defense counsel prior to arriving for trial: Captain (Capt) TA, 1st Lieutenant (1st Lt) KF, Capt DC, and Major (Maj) JE.[13] Capt DC and Maj JE testified at the *DuBay* hearing that the defense strategy involving their potential testimony was devised without ever having spoken to them. Capt DC fit into the defense case in chief regarding the sexual assault of Ms. KP, and Maj JE was "scheduled" to be a character witness (despite the fact that he was identified by 2d Lt CE as a witness to the events the evening of her alleged assault, as was 1st Lt KF, 2d Lt KW, and 2d Lt CB).

Upon arriving at Joint Base San Antonio-Lackland on the first day of trial, Capt DC was interviewed by trial defense counsel and "seemed scared." Trial defense counsel inquired as to why. Only then did they learn that he was afraid to testify as a result of his interactions with AFOSI. While trial defense counsel had filed a motion alleging illegal pretrial punishment in violation of Article 13, UCMJ, Capt DC was not listed as a witness for that motion. During the motions hearing, the military judge announced that he was not going to deal with the Article 13, UCMJ, motion until either right before any potential sentencing or as they worked through the sentencing case because it was not yet

---

[13] Maj JE was a Captain at the time of the trial but a Major at the time of the *DuBay* hearing. All references will use his current rank.

ripe. When the Article 13, UCMJ, motion was addressed, Defense's only witness[14] was Capt DC. The military judge concluded there was no Article 13, UCMJ, violation, but nevertheless opined "if that was [Capt DC's] treatment when he got to OSI, even early on in that interview, there's something wrong there." Capt DC testified at the *DuBay* hearing as well, and both times the military judge found him credible.

Maj JE also testified at the *DuBay* hearing. His testimony included that he was never asked by the defense team about his treatment by AFOSI but went on to say that when his AFOSI interview began, the lead agent indicated Maj JE looked "oddly comfortable." Maj JE tapped his Security Forces badge and stated "I've played this game before sir," to which the agent replied "So none of these tricks are going to really work on you." Despite the "collegial" nature of his own interview, he testified that he overheard another interview, described the interviewing agent as "an irate man" and stated his own interview had to pause at times because of the volume of what was going on in that other room. He eventually identified 2d Lt JR as the witness in the other room. The lead agent in his own interview had to leave the interview to deal with what was going on in the other room, and when the agent returned, he informed Maj JE that "they could not get that witness to talk and have even called the squadron commander to come and try to get her to come clean." Maj JE testified that what he heard did not sound professional or appropriate and believed the squadron commander should not have been there based on the implied statement from his own interviewer that 2d Lt JR had "lawyered up." The Monday following these interviews, Maj JE spoke with both 2d Lt KW and 2d Lt DC who indicated they were scared by the experience with AFOSI and they asked him if it was normal.

### 2. Law

We review claims of ineffective assistance of counsel de novo, applying the two-part test outlined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007) (citation omitted). Under that test, "in order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency

---

[14] Of note, Appellant testified as to the UCI motion, and trial defense counsel had requested the military judge consider all the evidence from the UCI motion when ruling on the Article 13 motion.

resulted in prejudice." *United States v. Green*, 68 M.J. 360 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687; *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

"[T]he defense bears the burden of establishing the truth of the factual allegations that would provide the basis for finding deficient performance." *Tippit*, 65 M.J. at 76 (citing *United States* v. *Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). When there is a factual dispute, however, appellate courts determine whether further fact-finding is required, including whether a post-trial fact-finding hearing is necessary. *Ginn*, 47 M.J. at 242–43.

The deficiency prong requires Appellant to show his counsel's performance fell below an objective standard of reasonableness, according to the prevailing standards of the profession. *Strickland*, 466 U.S. at 688. To determine whether the presumption of competence has been overcome as alleged by an appellant, we examine whether there is a reasonable explanation for counsel's actions and whether defense counsel's level of advocacy fell measurably below the performance ordinarily expected of fallible lawyers. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011).

The prejudice prong requires Appellant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### 3. Analysis

The military judge concluded that Appellant's trial defense counsel provided effective and competent counsel and were not deficient. We resolve the issue on a different basis. Assuming arguendo that Appellant's trial defense counsel's efforts were deficient, Appellant has failed to demonstrate he was prejudiced and is therefore not entitled to relief.

#### a. Failure to investigate and identify witnesses.

Mr. MW's original affidavit stated that the Defense attempted to track down and interview all known relevant witnesses regarding the allegations involving 2d Lt CE and 2d Lt RH. Based on the interviews performed, they called the witnesses that had relevant or exculpatory information. Maj MAV's affidavit states the initial interview of Maj JE was in January 2015, which matches Maj JE's testimony at the *DuBay* hearing. The strategy involving the "hug" of 2d Lt CE was that Appellant horsed around and hugged her on many occasions and it was consensual. Consequently, they did not elicit testimony from 1st Lt KF and Maj JE about this incident during their trial testimony.

18

Appellate defense counsel argued at the *DuBay* hearing that while every attorney may have a different approach, every lawyer has an obligation to prepare for trial. Trial defense counsel have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *United States v. Akbar*, 74 M.J. at 379 (quoting *Strickland*, 466 U.S. at 691). Strategic choices made by counsel "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Id.* (quoting *Strickland*, 466 U.S. at 690).

In this case, the trial defense counsel's reliance on the content of the statements contained within the ROI to develop their theory of the case is troubling. They interviewed those individuals on the prosecution's witness list. Based on that "knowledge," they identified defense witnesses from other individuals based on the content of their statements to AFOSI. None of these individuals were interviewed by the defense team until they arrived for trial.

Appellant's trial defense counsel were primarily concerned with the sexual assault allegation. Mr. MW testified that the non-sexual assaults were "easier to win" and he was surprised by the findings. We are troubled by the fact that the defense counsel did not interview many of the witnesses they planned to call at trial, until after they notified the Government of their intent to call these witnesses, and the witnesses travelled for trial. Furthermore, both counsel testified at the *DuBay* hearing that their client informed them he thought witnesses had been intimidated by AFOSI, and they knew about 2d Lt JR's interaction with AFOSI, including the fact that the commander, Col CH, had been called into the interview room with 2d Lt JR. Mr. MW testified that after the trial started (and after they interviewed Capt JC), there was no time to look into this issue further. This explanation falls short in that it does not address what actions they could have and should have taken *prior* to the start of trial. The civilian trial defense counsel characterized the failure to further pursue the intimidation or mistreatment of witnesses by AFOSI by stating "that's our bad."

We are further troubled by the fact that Mr. MW testified he did not believe 2d Lt KW was a factual witness that would help Appellant's case. Maj MAV went so far as to testify that because 2d Lt KW was not on the Government's witness list, they did not want to call him and highlight his statement to the trial counsel. This testimony is contradictory to the fact that the Defense filed UCI and illegal pretrial punishment motions in December 2014 that listed then 1st Lt KW as a witness. Finally, we note that when Appellant testified on the UCI motion, he maintained that his commander, Col CH, participated in AFOSI witness interviews, and Mr. MW included misconduct by AFOSI in his

opening statement. This information is not contained within the ROI, and there is no evidence of the extent of investigative efforts by defense counsel, if any, as to Col CH's presence at AFOSI during witness interviews. The declaration of Col CH provided by the Government is misleading. The declaration asserted he had been briefed but did not contain any reference to his participation in or presence at the AFOSI interview of 2d Lt JR. At the *DuBay* hearing, the Government conceded that Col CH should not have been in the AFOSI interview area.

### b. Preparation of Appellant.

Appellant's testimony on findings covers 23 pages of the transcript, primarily focused on the allegations involving Ms. KP. His cross-examination testimony regarding the hug of 2d Lt CE is consistent with his written description of events as annotated on a copy of the Article 32 report which he provided to both defense counsel via email in December of 2014, a month before trial. That document addressed the statements of 2d Lt CE and others regarding the actions of Appellant and included Appellant's comments regarding the facts asserted. In Mr. MW's declaration to this court, he stated that the defense theory was that Appellant gave 2d Lt CE "a consensual hug" and described the contact in his opening statement as consensual. At the *DuBay* hearing, both counsel testified that they had received and reviewed the information provided by Appellant in that December email. Furthermore, Appellant's trial testimony regarding dancing with 2d Lt RH asserting that he might have grazed her breast but denying touching her inner thighs and mid-section was consistent with his written description provided to counsel via the December 2014 email, as was the allegation that 2d Lt RH grabbed his genitals.

When Appellant testified on direct exam, he testified that he did not assault 2d Lt CE. On cross-examination, when asked "did you place your arms around [CE]" he replied "what she described up here, no." In the same declaration where Mr. MW stated their defense was based on consensual touching, he offers that when Appellant denied the hug on cross-examination, it changed everything. However, Appellant did not deny the hug, he simply denied it happened the way 2d Lt CE described. Nevertheless, at the *DuBay* hearing, Mr. MW acknowledged receiving and reading the email and attachments from Appellant in December 2014, which included Appellant's assertion "[CE] is making this whole encounter up" and goes on to describe a different scenario of the two of them hugging at that bar. Mr. MW testified at the *DuBay* hearing that the email did not affect his strategy.

Furthermore, Mr. MW's initial sworn declaration indicated Appellant had never provided him the version of dancing with 2d Lt RH that he testified to

on cross-examination at trial. At the *DuBay* hearing, Mr. MW had to retract that statement, and acknowledged that Appellant had in fact told both defense counsel *prior to trial* that 2d Lt RH had grabbed his genitals while they were dancing. Finally, Mr. MW indicated his preparation for Appellant's testimony did not include any mock or simulated cross-examination, consistent with the strategy he follows with all of his clients.

Trial defense counsel focused on the offenses involving Ms. KP and acknowledged the events involving 2d Lt CE and 2d Lt RH occurred, but did not amount to assaults. Appellant's testimony confirmed that he touched 2d Lt RH while dancing, which could have included touching her breast. While the Defense relied on mistake of fact or accident, the members did not agree. No witness other than 2d Lt RH was in a position to provide evidence to rebut this. The witnesses who could have testified they did not see anything would have contradicted Appellant's own testimony. With regard to 2d Lt CE, Appellant denied hugging her the way she described. Again, the potential defense witnesses would have testified they did not see this incident as she described. It came down to a credibility question for the members.

### c. Prejudice.

The information before us establishes that trial defense counsel failed to interview witnesses regarding the AFOSI tactics and the involvement of the commander during the investigation. However, there is no evidence that this would have changed the outcome of the trial. While the conduct is troubling, we are not convinced trial defense counsel's failure to more thoroughly vet potential witnesses resulted in prejudice.

With respect to preparing Appellant to testify, this trial relied heavily on the credibility of the complaining witnesses versus Appellant. Appellant's civilian trial defense counsel characterized Appellant as very involved in his case, to the point of micromanaging the Defense, which counsel found distracting at times. A difficult client is entitled to the same zealous representation as one who provides little to no assistance during trial preparation. Based on the evidence before us Appellant's testimony was consistent with what he had previously told his counsel. Neither Appellant nor his counsel has offered any further explanation as to how additional preparation would have affected the findings by the members. Therefore, we find Appellant was not prejudiced by his counsel's failure to reasonably investigate prior to developing their strategy or in their preparation of his testimony.

### E. Findings Instructions

#### 1. Law

We review the propriety of the instructions given by a military judge de novo. *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (citing *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F. 1996)). The military judge bears the primary responsibility for ensuring that the court members are properly instructed on the elements of the offense as well as potential defenses, and his duty is to provide an accurate, complete, and intelligible statement of the law. *Id.* (quoting *United States v. Westmoreland*, 31 M.J. 160, 164 (C.M.A. 1990)); *see United States v. Medina*, 69 M.J. 462, 465 (C.A.A.F. 2011); *United States v. Wolford*, 62 M.J. 418, 419 (C.A.A.F. 2006).

Defense counsel did not object to any of the instructions now challenged on appeal. Accordingly, we review for plain error. *United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013) (citing *United States v. Wilkins*, 71 M.J. 410, 412 (C.A.A.F. 2012)). However, a defense counsel's failure to object does not constitute waiver as waiver does not apply to required instructions such as affirmative defenses. *United States v. Stanley*, 71 M.J. 60, 63 (C.A.A.F. 2012) (citation omitted). When instructional errors have constitutional implications, as instructions involving affirmative defenses do, then the error is tested for prejudice under a "harmless beyond a reasonable doubt" standard. *Behenna*, 71 M.J. at 234 (citing *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007)).

Under plain error jurisprudence, "Appellant has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)). "[T]he failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006). Under the "harmless beyond a reasonable doubt" standard, we must be convinced beyond a reasonable doubt that the error did not contribute to Appellant's conviction in order to find such a constitutional error harmless. *Behenna*, 71 M.J. at 234 (citing *Lewis*, 65 M.J. at 87).

#### 2. Analysis

##### a. Instruction on Mistake of Fact as to Consent.

Appellant contends that although the military judge gave the legally correct instruction as to mistake of fact, he misapplied the law when he further instructed on "reasonable belief" with regard to the allegation involving 2d Lt RH. The military judge instructed on mistake of fact twice, initially regarding

the allegation involving Ms. KP. In that instruction, oral and written, the military judge correctly stated:

> Mistake of fact as to consent is a defense to that charged offense. "Mistake of fact as to consent" means the accused held, as a result of ignorance or mistake, an incorrect belief that the other person consented to the sexual conduct as alleged. The ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances. To be reasonable, the ignorance or mistake must have been based on information, or lack of it, that would indicate to a reasonable person that the other person consented . . . .
>
> . . .
>
> The burden is on the prosecution to establish the guilt of the accused. If you are satisfied beyond a reasonable doubt that the accused was not under the mistaken belief that the other person consented to the alleged sexual conduct, then the defense of mistake of fact does not exist. Even if you conclude that the accused was under the mistaken belief that the other person consented to the sexual conduct as alleged, if you are convinced beyond a reasonable doubt that, at the time of the alleged offense, the accused's mistake was unreasonable, the defense of mistake does not exist.
>
> . . .

With regard to the allegation involving 2d Lt RH, the military judge instructed, *inter alia*:

> A "battery" is an unlawful and intentional or culpably negligent application of force or violence to another. The act must be done without legal justification or excuse and without the lawful consent of the victim.
>
> . . .
>
> The evidence has raised the issue of mistake on the part of the accused concerning whether [2d Lt RH] consented to the physical contact alleged in Specification 1 of the Additional Charge.
>
> The accused is not guilty of the offense of assault consummated by a battery if: he mistakenly believed that [2d Lt RH] was consenting to the physical contact alleged and such belief on his part was reasonable.

> To be reasonable the belief must have been based on information, or lack of it, which would indicate to a reasonable person that [2d Lt RH] *was not consenting* to the physical contact that has been alleged.
>
> . . .
>
> The burden is on the prosecution to establish the accused's guilt. If you're convinced beyond a reasonable doubt that, at the time of the charged offense, the accused was not under the mistaken belief that [2d Lt RH] *consented* to the alleged physical conduct, the defense of mistake does not exist. Even if you conclude that the accused was under the mistaken belief that [2d Lt RH] consented to the alleged physical contact, if you are convinced beyond a reasonable doubt that, at the time of the charged offense, the accused's mistake was unreasonable, the defense of mistake does not exist.

(Emphasis added).

Appellant further relies on the fact that trial counsel repeated the instruction during closing argument and therefore relied on the error for the soundness of their argument. We do not agree. Appellant could rely on the mistake of fact defense if he reasonably believed 2d Lt RH consented to being touched on her breast by someone she just met. While the two may have been "grinding" on the dance floor, that does not in and of itself allow for any and all touching to be deemed consensual. Appellant's first touching of 2d Lt RH was her breast, and, as addressed above in our assessment of factual sufficiency, there is no evidence to reasonably believe she consented to that touching. Appellant's own testimony belies his argument on appeal.

While we agree that the military judge's inclusion of "not consenting" was an error, and clear and obvious in that it contradicts the previous instruction regarding consent as well as the sentence in the instruction directly above preceding it, it did not materially prejudice Appellant. The military judge stated multiple times that the burden of proof beyond a reasonable doubt was on the Government. Considering the totality of the instructions, the members were instructed as to the applicability of mistake of fact as to consent and were not confused or misled. Further, we are convinced beyond a reasonable doubt that this error did not contribute to Appellant's conviction, and therefore was harmless beyond a reasonable doubt.

### *b. Instruction on Witness Credibility.*

Appellant asserts that the military judge gave a "superfluous" instruction referred to as the "human lie detector" instruction, which stated:

> Only you, the members of the court, determine the credibility of the witnesses and what the facts in this case are. No witness can testify that a witness's or an alleged victim's account of what occurred is true or credible, or whether the witness believes another witness or an alleged victim.

> To the extent that you believed that any witness testified or implied that they believe an alleged victim or a witness, that a crime occurred, or that an alleged victim or witness is credible, you may not consider this as evidence that a crime occurred or that the alleged victim or witness is credible.

Appellant correctly cites the holding of *Knapp*, 73 M.J. at 36, that human lie detector evidence is generally not permitted during a court-martial and argues that his own testimony was inadmissible. However, he asserts that since the military judge did not provide a curative instruction at the time of Appellant's testimony, it was improper to provide the instruction later in the overall findings instructions given to the members. Appellant claims the instruction, following the character for truthfulness instruction, "essentially directed the panel to disregard the testimony of the defense's character witnesses."

The impetus for this instruction was the testimony of Appellant on cross-examination when he repeatedly alleged 2d Lt RH and Ms. KP lied and further commented that two other witnesses were not credible. Appellant's claim that there was no reason for the military judge to provide this instruction is not supported by the evidence. The instruction given was in fact curative, and served to properly instruct the members on their duty to determine credibility of the witnesses and evidence presented.

## F. Sentence Severity

### 1. Law

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[ ], on the basis of the entire record, should be approved." Article 66(c), UCMJ.

In determining whether a sentence should be approved, our authority is "not legality alone, but legality limited by appropriateness." *United States v.*

*Nerad*, 69 M.J. 138, 142 (C.A.A.F. 2010) (quoting *United States v. Atkins*, 23 C.M.R. 301, 303 (C.M.A. 1957)). This authority is "a sweeping congressional mandate to ensure 'a fair and just punishment for every accused.'" *United States v. Baier*, 60 M.J. 382, 384 (C.A.A.F. 2005) (quoting *United States v. Bauerbach*, 55 M.J. 501, 504 (A. Ct. Crim. App. 2001)). This task requires "'individualized consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180–81 (C.M.A. 1959)). While we have great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A. 1988).

### 2. Analysis

Appellant argues that a dismissal is an inappropriately severe sentence for convictions of assault consummated by a battery. To support his claim, Appellant cites his five combat deployments where he was credited with saving the life of a fellow service member and the lives of four civilians during an enemy attack, his 16 years of both enlisted and commissioned service, and his unrebutted good character. Appellant maintains his innocence as to the offenses, but avers that if we are satisfied that the conduct constituted a criminal offense, it is so minor in nature that a dismissal is clearly inappropriate.

While a dismissal is a severe punishment, it is not inappropriately so under the facts and circumstances of this case. Appellant was the senior ranking officer in his formal training class, composed of civilians, prior-service and non-prior-service commissioned officers. The facts and circumstances establish Appellant's guilt for inappropriately touching students without their consent. The evidence depicted Appellant, while intoxicated, "aggressively" or "persistently" chasing women who were members of his class. Additionally, it was Appellant's extended military service that provided him with the status of class leader, a position of authority with commensurate responsibilities. Appellant welcomed the authority and status, but was woefully deficient in his military bearing, demeanor, and general officership. As such, a dismissal is not inappropriately severe.

## G. Victim Impact Evidence.

### 1. Facts

The Government offered a written, unsworn statement by 2d Lt RH during its sentencing case. The statement indicated 2d Lt RH experienced immediate and extreme anxiety when Appellant "grabbed [her] around [her] waist, and

kissed [her] on the neck and cheek . . . ." She also asserted that, "As this happened very early in my Air Force career, it has in all made me go from a person who never doubted making this her career, to someone who wants out the first moment it is offered." There was no objection by the Defense and the military judge admitted the statement. Trial counsel referred to and read from the statement in sentencing argument. The military judge instructed the members as to how they should view the victim's unsworn statement:

> Lieutenant [RH] provided a victim impact statement. This statement is not under oath. This method of making a statement is an authorized means for a crime victim to bring information to the attention of the court and must be given appropriate consideration. Lieutenant [RH] cannot be cross examined by the defense or interrogated by court members upon making such a statement. The defense may offer evidence to rebut any statement of fact contained in them. The weight and significance attached to this unsworn statement rests within the sound discretion of each court member. You may consider that the statement was not under oath, the inherent probability or improbability whether it is supported or contradicted by evidence in the case as well as any other matter that may have a bearing upon its credibility. In weighing a victim impact statement you are expected to use your common knowledge, your common sense and your knowledge of human nature and the ways of the world.

**2. Law**

We review a military judge's admission or exclusion of evidence, including sentencing evidence, for an abuse of discretion. *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009) (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)). In the absence of waiver and objection at trial, decisions to admit evidence are reviewed for plain error. *Knapp*, 73 M.J. at 36. "Appellant has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *Id.* (citation omitted).

In 2013, Congress enacted Article 6b, UCMJ, pursuant to the National Defense Authorization Act (NDAA) for Fiscal Year 2014. Pub. L. No. 113–66, § 1701, 127 Stat. 672 (2013) (codified as 10 U.S.C. § 806b). Article 6b, UCMJ, incorporated additional rights of crime victims in presentencing provided in the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, with an effective date of 26 December 2013. Article 6b nearly mirrors the rights afforded to victims in civilian criminal trials under the CVRA and establishes that a victim has "[t]he right to be reasonably heard . . . at [a] sentencing hearing related to the

offense." 10 U.S.C. § 806b(a)(4)(B). The article provides no further guidance on the manner in which a victim could exercise that right and does not address the victim's right to be heard at presentencing in terms of presenting victim impact.[15]

### 3. Analysis

Appellant's mistaken belief as to the effective date of Article 6b serves as the foundation for his argument that because victim unsworn statements were not expressly authorized at the time of his trial, the military judge's decision to admit 2d Lt RH's statement was an abuse of discretion. While it is true that R.C.M. 1001A was not in existence at the time of trial, a victim's right to be heard at sentencing pursuant to Article 6b was.

The military judge put on the record that both the CVRA and Article 6b, UCMJ, gave victims a right to be "reasonably heard" at sentencing, and that federal courts have interpreted this term to mean allowing an unsworn victim impact statement in sentencing. This statutory provision includes the right of all crime victims to be "reasonably heard" at sentencing. The military judge was focused on allowing 2d Lt RH to exercise her right, and doing so without the pending implementing rules and regulations. As such, we find that the military judge did not abuse his discretion in permitting 2d Lt RH to provide her written unsworn statement, a mode now specifically authorized by the President. *See United States v. Parr*, No. ACM 38878, 2017 CCA LEXIS 86 (A.F. Ct. Crim. App. 7 Feb. 2017) (unpub. op.).[16]

### III. CONCLUSION

The record of trial is returned to The Judge Advocate General for remand to the convening authority for new post-trial processing consistent with the opinion. Article 66(e), UCMJ, 10 U.S.C. § 866(e).

---

[15] The President did not promulgate R.C.M. 1001A, providing guidance on how to implement Article 6b(a)(4)(B), until 17 June 2015, after Appellant's trial. R.C.M. 1001A(c) now indicates that the content of a victim's unsworn statement is limited to victim impact and matters in mitigation. R.C.M. 1001A(e) also now expressly permits a victim to make an unsworn statement orally, in writing, or both.

[16] *See also United States v. Hamilton*, 77 M.J. 579 (A.F. Ct. of Crim. App. 2017) (en banc), *rev. granted, United States v. Hamilton,* ___ M.J. ___ , No. 18–0135, 2018 CAAF LEXIS 241 (C.A.A.F. 23 Apr. 2018) (mem.) (Victim unsworn statements offered pursuant to R.C.M. 1001A are not aggravation evidence offered by the Prosecution, but a means by which a victim exercises their right to be heard on sentencing).

Thereafter, Article 66(b), UCMJ, 10 U.S.C. § 866(b), will apply.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court